UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BANK OF AMERICA, N.A.,

                                                Plaintiff,

                                                                No. 15-CV-00778-JWD-EWD

VERSUS

TERYL EMERY DDS, LLC, and
TERYL EMERY,

                                Defendants.

**RULING AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Before the Court is the Motion for Summary Judgment ("Plaintiff's MSJ"), (Doc. 8),

filed by Bank of America, N.A. ("Bank of America," "BOA," "Lender," or "Plaintiff"), and the

Defendants' Opposition to and Cross Motion for Summary Judgment ("Defendants' MSJ"),

(Doc. 11), submitted by Doctor Teryl K. Emery ("Dr. Emery" or "Guarantor") and Teryl Emery

DDS, LLC ("Emery DDS" or "Borrower") (collectively, "Defendants"). In support of its motion

and in response to Defendants' MSJ, Plaintiff tendered the Reply Memorandum in Further

Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendants' Cross-

Motion for Summary Judgment ("Plaintiff's Reply"). (Doc. 18.) Similarly, to counter Plaintiff's

Reply and to strengthen their own dispositive motion, Defendants filed the Reply Memorandum

in Support of Defendants' Cross Motion for Summary Judgment ("Defendants' Reply"). (Doc. 19.)

In these four motions, Defendants and Plaintiff (collectively, "Parties") dispute a single issue: whether Defendants are bound by the Amended and Restated Loan Agreement ("Amended Loan Agreement"), as well as the Security Agreement ("Security"), and Continuing and Unconditional Guaranty ("Guaranty") (collectively, "Amended Loan Documents"), that modified the financial and security particulars of the Parties' prior loan arrangement and that Defendants indisputably executed in the summer of 2015. For their part, Defendants deny this contract's validity, raising sundry defenses to its enforcement, including a lack of consent, an offer's revocation, and duress. However, once well-established principles of contract law are employed, not one of these defenses withstands scrutiny,[1] and the Amended Loan Documents must be upheld as a matter of plain and unambiguous contract law. For this reason, as more fully explained below, this Court GRANTS Plaintiff's MSJ and DENIES Defendants' MSJ.

## II.     BACKGROUND

### A.     RELEVANT FACTS

### 1.     Original Contract and First Default

On September 17, 2010, Dr. Emery formally incorporated Emery DDS, a limited liability company domiciled at 5555 Essen Lane, Suite D, Baton Rouge, Louisiana 70809, and began as—and remains—this corporation's only member. LA. SEC'Y OF STATE, https://coraweb.sos.la.gov/CommercialSearch/CommercialSearchDetails.aspx?CharterID=90466

---

[1] With the documents so plain and clear, this Court sees no need for oral argument on this matter.

8_YBF52 (last visited on July 27, 2016).[2] On July 1, 2010, Emery DDS executed a Project Finance Term Loan Agreement ("Loan Agreement"[3]) with Bank of America, a national banking association headquartered in Charlotte, North Carolina. (Doc. 1 at 1–2), in the principal amount of $350,000, and described itself as a "promissory note, security agreement and guaranty, all of which [were] to be construed together and binding upon the parties." (Doc. 8-1 ¶¶ 1–2 at 1; Doc. 8-4 at 1; *see* Doc. 11-2 ¶ 1 at 1.) The Loan Agreement provided that Bank of America would make advances to Emery DDS up to the loan amount of $350,000 for the purpose of financing the refurbishment and operation of Emery DDS's professional dental project, explicitly defined in the Loan Agreement as the "Project." (Doc. 8-1 ¶ 4 at 2; Doc 8-4 at 3, 12.) The Loan Agreement contemplated a closing date for the Project and specified that if any monthly payment was "not paid on or before the ninth (9th) day after the Payment Date a late charge [would] be assessed on the account of [Emery DDS] for the indebtedness in an amount equal to the greater of: (a) $0.15 per dollar of any late Monthly Payment, or (b) $15.00." (Doc. 8-1 ¶ 4 at 2; Doc. 8–4 at 4.) Emery DDS signed the Loan Agreement on July 14, 2010. (Doc. 1-1 at 12; Doc. 8-4 at 13.)

The Loan Agreement contained several other relevant provisions. According to its seventeenth paragraph, Emery DDS granted Bank of America "a security interest in the Collateral and the proceeds of the Collateral to secure payment and performance of indebtedness." (Doc. 1-1 at 3; Doc. 8-4 at 4.) Later, "Collateral" is defined as "all of the business [and] personal property and business assets of Borrower[, Emery DDS], and, if applicable, any Guarantor[, Dr. Emery], wherever located, and now or hereafter acquired." (Doc. 1-1 at 10; Doc.

---

[2] Pursuant to Federal Rule of Evidence 201(b)(2), "in the case of publicly available documents like corporate filings," a court may take judicial notice of what the documents contain. *Am. Packing & Crating of Ga. LLC v. Resin Partners, Inc.*, No. CV415-256, 2016 U.S. Dist. LEXIS 11428, at *4 n.2 (S.D. Ga. Feb. 1, 2016).

[3] The relevant documents appear as attachments to the complaint and Plaintiff's MSJ.

8-1 ¶ 5 at 2; Doc. 8-4 at 11.) In great detail, the Loan Agreement identified several events as triggering its default, including the "failure to make any payment of the Indebtedness and, except for a failure to pay at the maturity date, such failure continues for 10 days after it first becomes due." (Doc. 8-1 ¶ 7 at 3; Doc. 8-4 at 6–7.) Additionally, as stated in paragraph 24.A, it provided that "upon the occurrence of an Event of Default, [Emery DDS] and/or [Dr. Emery] shall have thirty (30) days from the date of Lender's written notice of default . . . to cure the event of default(s) set forth by [Bank of America] in the Notice of Default." (Doc. 8-1 ¶ 7 at 3; Doc. 8-4 at 6–7.)

In its final two pages, the Loan Agreement further specified the Guarantor's duty: "To the extent applicable, all of the terms and conditions of the foregoing sections of the Agreement apply to each Guarantor . . . ." (Doc. 1-1 at 13–14; Doc. 8-4 at 14–15.) As it clarifies, "[e]ach Guarantor is absolutely, unconditionally, jointly and severally guarantees the prompt payment when due of all Indebtedness," bound to "immediately pay to Lender[, Bank of America,] the outstanding balance of all Indebtedness" upon the Borrower's failure to "pay all or any of any Indebtedness when due." (Doc. 1-1 at 13; Doc. 8-4 at 14.) Dr. Emery signed this guarantee portion of the Loan Agreement on July 14, 2010. (Doc. 1-1 at 14; Doc. 8-4 at 15.)

To perfect its security interest, Bank of America filed a UCC Financing Statement with respect to the Collateral specified in the Loan Agreement. (Doc. 1-2 at 1–3; Doc. 8-1 ¶ 6 at 2; Doc. 8-5 at 2–4.) The amount covered by the Loan Agreement was increased to $370,000 on May 11, 2011, and to $401,500 on November 9, 2011. (Doc. 1-3 at 1–2; Doc. 8-1 ¶ 8 at 3; Doc. 8-6 at 2–3; Doc. 8-7 at 2.) On November 28, 2011, Dr. Emery signed an additional guaranty "[f]or the purpose of inducing Bank of America . . . to make, extend, and renew a loan or loans, other extensions of credit or financial accommodations of any kind or nature whatsoever for the

account of each Borrower . . . ." (Doc. 1-4 at 1; Doc. 8-1 ¶ 10 at 3; Doc. 8-8 at 2.) On December 1, 2011, the project loan was converted to a permanent loan in the principal amount of $424,264.61, with a term of 180 months at a fixed rate of interest of 8.45%. (Doc. 8-1 ¶ 9 at 3; Doc. 8-7 at 2–3.) Both Emery DDS, via Dr. Emery, and Bank of America, via its representative, affixed their signature to this final disbursement, change, and repayment schedule on that day. (Doc. 8-7 at 3

Emory DDS defaulted under the Loan Agreement by failing to pay the monthly installment due March 1, 2014 and each payment due thereafter. (Doc. 1-5 at 1; Doc. 8-1 ¶ 11 at 4; Doc. 8-9 at 2.) Subsequently, invoking paragraph 24.A, Bank of America provided Dr. Emery, in his capacity as Guarantor, and Emery DDS, in its role as Borrower, with a written notice of default. (Doc. 8-1 ¶¶ 11-12 at 4; Doc. 8-9 at 2.) Plaintiff gave Defendants an opportunity to cure the total payment default of $75.246/40 by June 1, 2015. (Doc. 8-1 ¶ 12 at 4; Doc. 8-9 at 2.) As this letter warned Defendants, "[i]f you fail to pay th[is] Past Due Amount on or before the Cure Date [of June 1, 2015], Bank of America may exercise any of its rights and remedies under the [Loan] Agreement, including its right to accelerate all amounts due under the [Loan] Agreement and enforcement of any and all security interests." (Doc. 1-5 at 1; Doc. 8-9 at 2.) This missive is dated May 1, 2015. (Doc. 1-5 at 2; Doc. 8-9 at 3.) Neither Emory DDS nor Dr. Emery tendered any payments to cure the default.[4] (Doc. 8-1 ¶ 13 at 4.)

---

[4] Defendants deny a default occurred. However, as shown below, the default's reality has no effect on whether the Amended Loan Agreement binds Defendants now.

**2.      Post-Default Negotiations: Events Leading to the Execution of the Amended Loan Documents**

On July 17, 2015, in an effort to address this default status, Dr. Emery proposed a modification of the Loan Agreement. (Doc. 1-6 at 1; Doc. 8-10 at 2.) Having "looked at areas that . . . [he] could cut back," the proposal would require a monthly payment of $3,200 per month. (Doc. 8-1 ¶ 14 at 4; Doc 1-6 at 1; Doc 8-10 at 2.) Bank of America, represented by Ms. Brenda R. Temple, Vice President ("Temple"), accepted this proposed scheme. (Doc. 8-1 ¶ 15 at 4.) Accordingly, the Amended Loan Agreement, embodying the modified payment schedule that Dr. Emery had proposed, was promptly executed by Bank of America. (*Id.*; *see also* Doc. 11-4 at 1.)

Dated and mailed on August 3, 2015, Dr. Emery received the Amended Loan Agreement on August 4, 2015. (Doc. 8-11 at 2; Doc. 11-4 at 1, 3, 7.) The Amended Loan Agreement set forth the principal amount of the new loan as $458,759.71, and stated that the amended loan documents were intended to "restate and replace all Original Loan Documents in all respects except to the extent that any of the Original Loan Documents were executed for the purpose of granting the Bank a security interest in any collateral owned by any Obligor, granting a subordinated interest in a loan, or guaranteeing the indebtedness and obligations of Borrower to Bank." (Doc. 1-7 at 1; Doc. 8-1 ¶ 16 at 4–5; Doc. 8-11 at 2.) By design, with the Amended Loan Agreement, Plaintiff consented to the amended terms that Dr. Emery had first proposed, (Doc. 8-1 ¶ 15 at 4), in his July email, (Doc. 1-6 at 1; Doc. 8-10 at 2.) Significantly, the Amended Loan Agreement identifies the date of its creation and execution as August 3, 2015, a date to which Dr. Emery acceded on his own and Emery DDS' behalf. (Doc. 1-7 at 1, 11; Doc. 8-11 at 2, 12.) On that same date, Dr. Emery signed an authorization to borrow in the name of Emery DDS, (Doc.

1-7 at 14–15; Doc. 8-11 at 15–16), as well as the Security, (Doc. 1-8 at 1–8; Doc. 8-1 ¶¶ 18–19 at 5; Doc. 8-12 at 2–9), and Guarantee, (Doc. 1-9 at 1–10; Doc. 8-1 ¶¶ 20–21 at 6; Doc. 8-13 at 2–11). As a matter of plain contract text, the Amended Loan Documents bear a single date: August 3, 2015.

Nonetheless, their receipt by Plaintiff did not occur on that date. Instead, having heard nothing from Defendants soon after this contract's dispatch, on August 10, 2015, Temple inquired by an email to Dr. Emery about the status of the Amended Loan Agreement on August 10, 2015. (Doc. 11-2 ¶ 5 at 2; Doc. 11-4 at 8.) Specifically, she wrote: "Please advise if you have returned the signed modification documents sent to you on August 3rd." (Doc. 11-4 at 3.) In response, dated August 11, 2015, Dr. Emery wrote: "I am reading through the documents. Will mail them tomorrow." (*Id.*)[5] Ms. Temple responded "Thank You." (*Id.*) However, on August 13, 2015, Dr. Emery sent an email to Temple stating that he did not understand the document and requesting an explanation from Temple. (Doc 11-2 ¶ 6 at 2; Doc. 11-4 at 5.) Via email, on August 18, 2015, Temple advised Dr. Emery to "review the document with [his] attorney" and informed him of the day—August 21, 2015—by which Bank of America "must have the executed documents." (Doc. 11-4 at 7; *see also* Doc. 11-2 ¶ 7 at 2.) If Temple did not receive the documents by that date, Dr. Emery was warned, then Temple would instruct Bank of America's legal counsel "to move forward." (Doc. 11-4 at 7; *see also* Doc. 11-2 ¶ 7 at 2.)

Dr. Emery responded at 7:22 p.m. on August 19, 2015. (Doc. 11-4 at 7.) He informed Temple that "[m]y attorney has completed going over the documents and has scheduled to meet me tonight." (*Id.*) On August 20, 2015, Temple replied: "That's good news. Please return the properly executed documents today in the UPS envelope that was included in the package." (*Id.*;

---

[5] In Defendants' MSJ and his affidavit, Dr. Emery gives a different construction of this exchange.

*see also* Doc. 11-2 ¶ 7 at 2.) Dr. Emery complied with Temple's request and mailed the signed

documents on August 20, 2015. (Doc. 11-2 ¶ 7 at 2.) Simply put, although Dr. Emery "believe[d]

he had no choice," and though "not having been able to actually speak with nor meet with his

attorney," he admits to mailing the Amended Loan Documents on August 20, 2015. (Doc. 1-1 at

2; *see also* Doc. 11-2 ¶ 7 at 2.) Temple received the Documents on Friday, August 21, 2015.

(Doc. 11-4 at 25.)


**3.      Post-Execution Events**

On the same day, at 3:29 p.m., Counsel for Defendants ("Emery's Counsel") sent a letter

to Temple's inbox. (Doc. 11-4 at 10.) Via this latest email, "revised Loan Modification

Documents were submitted on behalf of Dr. Emery." (*Id.* at 11.) Noting that she had been

"aware" that Dr. Emery "wrote to you on August 13, 2015 requesting a review and explanation

of the documents submitted," Emery's Counsel continued: "On [sic] yesterday, without being

afforded the benefit of the requested review with any representative of Bank of America, Dr.

Emery, under duress, inadvertently submitted the original documents without any explanation or

understanding of the documents." (*Id.*; *see also* Doc. 11-2 ¶ 8 at 2.) On behalf of Dr. Emery,

Defendants' counsel "**REVOKE**[**D**], **RESCIND**[**ED**] and request[ed] that . . . [the Amended

Loan Documents] . . . be **VOIDED** so that Dr. Emery . . . [might] be afforded the opportunity to

negotiate a fair, equitable, and reasonable modification to his loan." (Doc. 11-4 at 11 (emphasis

and capitalization in original); *see also* Doc. 11-2 ¶ 8 at 2.) This same attorney also submitted

proposed modifications to the Amended Loan Agreement, including replacing the "Continuing

and Unconditional Guaranty" with a "Limited Guaranty." (Doc. 11-4 at 10–11.)

Temple responded to this request on Sunday, August 23, 2015. (*Id.* at 25.) In brief, Temple rejected the modifications to the Amended Loan Agreement. (*Id.*) She informed Emery's Counsel that Bank of America had "booked the [Amended Loan] Agreement as [it was] executed and received by [her] on Friday, August 21." (*Id.*) Temple added: "Since Dr. Emery ha[d] signed and returned the [Amended Loan Documents], he [was] now bound by those terms." (*Id.*) If he refused to "pay according to those terms, then bank outside legal counsel will be instructed to proceed with filing a collection suit against him." (*Id.*; *see also* Doc. 11-2 at 2 –3.)

Emery's Counsel replied on August 24, 2015. (Doc. 11-4 at 26.) Therein, she insisted that the Amended Loan Documents had been "**<u>REVOKED</u>**." (Doc. 11-4 at 26.) This email further contended the contract had been "inadvertently received" and that the revocation and receipt had both arrived on August 21, 2015; no time stamp was appended or suggested. (*Id.*) Once more, Emery's Counsel described the Amended Loan Documents as "oppressive" and "executed under duress." (*Id.*) Moreover, Emery's Counsel characterized the proposed modifications as a counter-offer. (*Id.*)

The Amended Loan Agreement stated that Emery DDS' first payment under the modified payment plan was due on September 1, 2015. (Doc. 1-7 at 2; Doc. 8-11 at 3.) Emery DDS failed to make that first monthly payment. (Doc. 8-1 ¶ 22 at 6.) Accordingly, Bank of America notified both Dr. Emery and Emery DDS of their default under the Amended Loan Agreement. (*Id.* ¶ 23 at 6.) Since that date, Defendants have missed every monthly payment per the Amended Loan Documents. (*Id.* ¶ 24 at 7.)

On September 10, 2015, Temple sent a letter to Dr. Emery. The letter requested Dr. Emery's signature on a partial revision of the Amended Loan Agreement due to the existence of a "scrivener's error" in its second section. (Doc. 11-4 at 29–31, *see also* Doc. 11-2 ¶ 11 at 3.) At

the time, Temple explicitly informed Defendants that the "letter shall serve to add to Section 2 of the [Amended] Loan Agreement." (Doc. 11-4 at 31.) However, "[a]ll other sections of the [Amended] Loan Agreement shall remain in full force and effect." (*Id.*)

## B.     PROCEDURAL HISTORY

Bank of America filed Plaintiff's MSJ on January 11, 2016. (Doc. 8-1.) On February 1, 2016, Defendants' MSJ arrived. (Doc. 11.) Bank of America submitted Plaintiff's Reply on February 17, 2016. (Doc. 18.) Defendants' Reply came on March 2, 2016. (Doc. 19.)

## C.     PARTIES' ARGUMENTS

## 1.     Plaintiff's MSJ

In its dispositive motion, Bank of America advances a simple argument: "Because there are no issues of material fact and because Bank of America is entitled to summary judgment as a matter of law, the Court should grant Bank of America's motion for summary judgment." (Doc. 8-2 at 2.) Necessarily, it begins with the contracts at issue here. Thus, as a matter of incontrovertible fact, Plaintiff points out that "[Defendants] executed the Amended Loan Agreement and the Security Agreement on August 3, 2015"; "the repayment terms set forth in the Amended Loan Agreement," it adds, "were the [same] terms proposed by [Dr. Emery, on behalf of Emery DDS] after [he] had defaulted under the terms of the Original Loan Agreement." (*Id.* at 9.) With equal certainty, there can be "no dispute that Guarantor [Dr. Emery] executed a binding Unconditional Guaranty in which he guaranteed [Defendant's] Obligations to Bank of America." (*Id.*) Signed and executed on August 3, 2015, the Amended Loan Documents "are binding on, and enforceable, against [Emery DDS] and [Dr. Emery]" under Louisiana law, which

purportedly establishes that "unless specifically denied in pleadings, each signature on an instrument is admitted and [the] holder thus makes out [its] case by mere production of [the] instrument." (Doc. 8-2 at 9 (relying on *Am. Bank v. Saxena*, 553 So. 2d 836, 842 (La. 1989), and *Dulin v. Levis Mitsubishi, Inc.*, 2001-2457 (La. App. 1st Cir. 12/20/02); 836 So. 2d 240, 345).) Purely as a consequence of these interlocking documents' unambiguity, Emery DDS owes Bank of America the amounts due under the Amended Loan Agreement, and Dr. Emery too "is liable for [Emery DDS]'s breach of the Amended Loan Agreement," having "unconditionally guaranteed [Emery DDS]'s obligations." (*Id.* at 9–10.)

With Defendants' distinct but concurrent responsibility established, Plaintiff asserts an absence of dispute can exist as to the financial consequences of Defendants' failure to remit a cent since September 1, 2015. Simply put, "[Emery DDS] defaulted under the Amended Loan Agreement by failing to pay the monthly installment due September 1, 2015 and each installment due thereafter," and that "[d]espite demand by Bank of America, neither [Emery DDS] nor [Dr. Emery] have paid any amounts to cure [Emery DDS'] default under the Amended Loan Agreement." (*Id.* at 10.) As it had done before, based on the Amended Loan Agreement's explicit formula, Plaintiff calculates "the amounts owed" as $458,759.81 (unpaid principal), $10,570.59 (interest), and $512 (late fees), for a total of $469,842.30, "plus interest accruing thereafter at the daily rate of $66.90, together with late charges, attorney's fees, expenses and costs that accrued as of January 8, 2016, and that continue to accrue thereafter, until all obligations of [Emery DDS ] and [Dr. Emery] to Bank of America under the Amended Loan Agreement are paid in full." (*Id.* at 9–11 (citing, among others, *Stewart & Stevenson Servs., Inc. v. Superior Boat Works, Inc.,* No. 94-2332, 1996 U.S. Dist. Lexis 12217, at *21–22, 1996 WL 470642, at *7–8 (E.D. La. Aug. 16, 1996), and *CIT Grp./Equip. Fin., Inc. v. Airport Shuttle Inc.,*

No. 06-3272, 2008 U.S. Dist. Lexis 9807, at *3–4, 2008 WL 39369, at *1 (E.D. La. Feb. 11, 2008)).) In this case, then, according to Plaintiff, plain contract language establishes Defendants' responsibility for every penny owed pursuant to the Amended Loan Agreement.

**2.      Defendants' Arguments**

In Defendants' MSJ, Dr. Emery and Emery DDS contend that "there are genuine issues of material fact as to the matters asserted by Plaintiff Bank of America, and Plaintiff is not entitled to judgment as a matter of law." (Doc. 11-1 at 1.) Additionally, Defendants claim that "there are no genuine issues of material facts as to [their] claims, and . . . are entitled to judgment as a matter of law." (Doc. 11-1 at 5.) In general, Defendants repeatedly invoke the "substantive law regarding when a contract is formed under Louisiana Law," specifically Articles 1927-29, 1757, and 1759 of the Louisiana Civil Code.[6] (Doc. 11-1 at 5–6 (internal quotation marks omitted).)

Based on these provisions, Defendants make a series of arguments challenging the claim that a valid contract was formed with respect to the Amended Loan Documents. The primary argument raised is that Dr. Emery's "delay in giving [his and Emery DDS'] consent to Bank of America's [Amended Loan Agreement] before being threatened by []Temple, that is not accepting Bank of America's initial offer dated August 3, 2015 within a *reasonable time,* was a tacit rejection and/or refusal to consent to the terms proposed by Bank of America." (Doc. 11-1 at 6 (relying on LA. CIV. CODE art. 1928).) Moreover, once Dr. Emery requested an explanation of the terms in the Amended Loan Agreement, Bank of America's refusal to explain the

---

[6] In this ruling, any and all references to "Article" or "Articles" are to parts of the Louisiana Civil Code unless otherwise noted. In addition, "Civil Code" refers to the Louisiana Civil Code.

documents constituted as "bad faith" as forbidden by Article 1759. (*Id.* (citing LA. CIV. CODE art. 1759).)

After making these points, Defendants launch a fusillade, arguing that the Amended Loan Documents were only "inadvertently sent" to Bank of America, "submitted under duress," and that properly revoked and rescinded by notice to Bank of America on August 21, 2015. (*Id.* at 6 – 7.) The support Defendants provide for this revocation argument is that "[a]n offer *not irrevocable* under Civil Code Article 1928 may be revoked before it is accepted." (*Id.* at 7 (citing LA. CIV. CODE art. 1929).) As the offer made by Bank of America on August 3, 2015, did not specify a period of time for acceptance, it was "not irrevocable," and Defendants "were within their right to revoke their conditional acceptance because it had not been accepted when he notified Bank of America that it was being revoked." (*Id.* at 7) Instead, on that date, Defendants "[s]imultaneously submitted a counter-offer, rejecting the oppressive terms of [the Amended Loan Agreement]." (Doc. 11-2 ¶ 8 at 2; *see also* Doc. 11-1 at 2; Doc. 11-4 at 10–12.) For evidence, Defendants cite to another Temple email: as the Amended Loan Documents had not been "processed/accepted/booked" on August 24, 2015, Dr. Emery's attempted revocation, sent on August 21, 2015, necessarily predates the Amended Loan Documents' acceptance. (Doc. 11-1 at 3.)[7] In sum, because Bank of America did not "accept the counteroffer of [Defendants] dated August 21, 2015," that no contract was formed between Bank of America and Defendants. (Doc. 11-1 at 8, *see also* Doc 11-4 at 27.)

Separately, Defendants emphasize the significance of the September communications from Plaintiff involving the so-called "scrivener's error." In general, Defendants assert that this communication, (Doc. 11-4 at 29 –31), constituted a counteroffer in accordance with Article

---

[7] While Dr. Emery says different in the Defendants' MSJ, (Doc. 11-1 at 3), the actual email provided as an exhibit to this motion says otherwise, (Doc. 11-4 at 25).

1943. (Doc. 11-1 at 7–8.) In Defendants' view, this counteroffer extinguished any acceptance inferred by their own submission of the Amended Loan Documents, the Parties having never "agreed on the terms of the proposed [l]oan [m]odification." (*Id.* at 3; *see* also Doc. 19 at 3.)

### 3.   Plaintiff's Reply

In Plaintiff's Reply, Bank of America reiterates its core contention: under Louisiana law, "the contracting parties' consent is 'established through offer and acceptance.'"(Doc. 18 at 2 (citing LA. CIV. CODE art. 1927).) "[A]fter [Emery DDS] defaulted under the original Loan Agreement, Defendants proposed to modify the Loan Agreement with a $3,200 monthly payment. (*Id.* at 3; *see also, e.g.*, Doc. 8-2 at 4; Doc. 8-10 at 2.) Bank of America then "agreed to that proposal and sent the Amended Loan Documents to Defendants for execution," which Defendants then "executed and returned the Amended Loan Documents to Bank of America."(Doc. 18 at 3; Doc. 8-2 at 4; Doc. 8-11 at 12.) As such, the application of two legal principles was triggered on August 20, 2015: first, "[w]hen an offer is revocable, acceptance 'made in a manner and by a medium suggested by the offer or in a reasonable manner and by a reasonable medium is effective when transmitted by the offeree," and second, "[a] binding contract is formed upon the offeree's acceptance." (Doc. 18 at 3 (citing LA. CIV. CODE art. 1935 and *Woods v. Morgan City Lions Club,* 588 So. 2d 1196, 1200 (La. App. Ct. 1991)); *see also, e.g.*, Doc. 8-2 at 4; Doc. 8-11 at 12.) Legally, "[a]fter a contract is created through offer and acceptance, the contract has 'the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law.'" (Doc. 18 at 2 (citing LA. CIV. CODE art. 1983).) Accordingly, Defendants' revocation was entirely ineffective, for "[o]nly after Bank of America received the executed Amended Loan Documents did Defendants unilaterally

attempt to revoke/rescind the Amended Loan Documents." (Doc. 18 at 3; *see also* Doc. 11-1 at

7; Doc. 11-2 ¶ 7 at 2; Doc 8-11 at 12.) As mutual consent to one more modification never took

place (Doc. 18 at 3 (citing, among others, *Guarantee Sys. Constr. & Restoration, Inc. v. Anthony*,

97-1877 (La. App. 1st Cir. 09/25/98); 728 So. 2d 398, 403)), the Amended Loan Documents

bind both Bank of America and Defendants.

Plaintiff then rejects Defendants' duress and forbearance arguments. As to the latter,

"[n]one of the conduct Defendants complain about in their opposition amounts to physical

conduct or improper threats by Bank of America," the definition of "duress" under Louisiana

law. (Doc. 18 at 3–4.) As for the former, Defendants "have not cited and cannot prove that a

signed, written forbearance agreement exists," (Doc. 18 at 5; *see also* Doc. 11-1 at 6; Doc. 11-2 ¶

2 at 1–2), though the law requires that "a lender's oral promise to forebear from enforcing a loan

must be in writing and signed by both the creditor and debtor to be enforceable, (Doc. 18 at 5

(citing *Loraso v. JPMorgan Chase Bank, N.A.*, No. 13-4734, 2013 U.S. Dist. LEXIS 152325, at

\*18, 2013 WL 5755638, at \*6 (E.D. La. Oct. 23, 2013), and *Countrywide Home Loans, Inc. v.*

*Anderson*, No. 07-3353, 2010 U.S. Dist. LEXIS 98307, at \*12–13, 2010 WL 3791909, at \*5

(E.D. La. Sept. 20, 2010)).)

Lastly, Plaintiffs makes two more procedural points. First, "Defendants did not submit 'a

separate, short and concise statement of material facts as to which the opponent contends there

exists a genuine issue to be tried' in accordance with Local Rule 56(b). (*Id.* at 2 n.1.) As a result,

"Bank of America's statement of material facts is deemed admitted in its entirety."[8] (*Id.*) Second,

---

[8] Defendants respond in kind, alleging that "Plaintiff failed in every respect to controvert
Defendants' Statement of Material Facts (Doc. 11-2), and claiming that "Plaintiff simply resorts
to conclusory statements." (Doc. 19 at 3). As this Court has previously held, *Porter v. Dauthier*,
No. 14-00041-JWD-RLB, 2015 U.S. Dist. LEXIS 170338, at \*5–8, 2015 WL 9307270, at \*2–3

"even if the Amended Loan Documents were somehow revoked," Bank of America contends, "this simply means the original Loan Agreement and Additional Guaranty are operative." (*Id.* at 3 n.2.) Because "there is no dispute that the original loan is in default[,] . . . summary judgment must still be granted in favor of Bank of America based on Borrowers' defaults under the original loan." (*Id.*)

In conclusion, the Plaintiff points out that "[t]he only material Fact Defendants have challenged is their consent to the Amended Loan Documents." (Doc. 18 at 5.) Yet, "[a]ll of Defendants' arguments regarding contractual consent are legally erroneous and . . . [they] have raised no genuine issue of material fact regarding their consent to the Amended Loan Documents." (Doc. 18 at 5.)

### 4.    Defendants' Reply

In their final filing, aside from repeating their prior points, Defendants first deny the relevance of their default under the original loan. As Defendants note, "Bank of America did not bring an action alleging default of the original loan agreement." (Doc. 19 at 1.) Rather, "[t]he purported transaction that is the subject of this lawsuit is the . . . Amended Loan Agreement. (*Id.* at 12) Afterward, Defendants contest Bank of America's assertion that "there is no writing evidencing the period of forbearance . . . granted . . . on the original loan." (*Id.* at 2). Indeed, based on the relevant evidence, prior to August 21, 2015, "forbearance was already previously *voluntarily* given to Defendant- with Bank of America's *consent*." (*Id.* (emphasis in original).) The only reason they included the issue of forbearance in their first motion, (Doc 11),

---

(M.D. La. Dec. 21, 2015), the failure of parties to follow the strict letter of the Local Rules cannot negate or obscure the existence of contested facts obvious from the record.

Defendants explain, was "to show that there was no default on the original loan and that they were negotiating in good faith with Bank of America, *after* the voluntary period of forbearance, to come to terms that were acceptable to all parties." (*Id.*)

## III.   DISCUSSION

### A.   GOVERNING LAW

#### 1.   Summary Judgment Standard

Per Federal Rule of Civil Procedure 56(a),[9] summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014). A court construes all facts and evidence in the light most favorable to the nonmovant. *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013). In response to another's motion, the nonmovant cannot rely on "[c]onclusional allegation and details, speculation, . . . unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002).

Still, "[w]hen both parties have submitted evidence of contradictory facts," *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005), a court is bound to "draw all

---

[9] In this ruling, any and all references to "Rule" or "Rules" are to one or more of the Federal Rules of Civil Procedure unless otherwise noted.

reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson Plumping Prods.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105, 122 (2000); *see also Anderson*, 477 U.S. at 248 (emphasizing the irrelevance of "[a]ny proof or evidentiary requirements imposed by the substantive law," materiality "not a criterion for evaluating the evidentiary underpinnings of [factual disputes]"). It thus cannot "make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150. This command—that a district court "eschew making credibility determination or weighing the evidence," *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011) (citing *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)); *accord, e.g.*, *Flythe v. Dist. of Columbia*, 791 F.3d 13, 22 (D.C. Cir. 2015)—applies so long as the record retains patches of reasonable ambiguity that have not been artificially manufactured. *See, e.g.*, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895, 901 (2014) ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.").

So constrained, by Rule 56, this Court must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 9A WRIGHT, *supra*, § 2529. To wit, although this Court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, *cited in Havera*, 723 F.3d at 591. Within the narrow domain of Rule 56, summary judgment is hence inappropriate (1) if there are legitimate, not superficial or frivolous, factual disputes that may affect the outcome of the case under the applicable substantive law, *see Anderson*, 477 U.S. at 248, and (2) so long as the nonmovant does not exclusively rely on "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence," *Little v. Liquid Air Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994). Significantly, under controlling state law, "[w]hen a contract can be construed from the four corners of the instrument, interpretation of the contract presents a question of law that can be decided on summary judgment." *Young v. Tolintino*, 26 So. 3d 835, 838; *see also, e.g.*, *Sims v. Mulhearn Funeral Home,* Inc., 2007-0054 (La. 05/22/07), 956 So. 2d 583, 590.

### 2.      General Principles of Louisiana Contract Law

Under Louisiana law, "a contract is defined as an agreement by two or more parties whereby obligations are created, modified, or extinguished." LA. CIV. CODE art. 1906; *see also Elder v. Elder & Elder Enterprises, Ltd.*, 06-0703, p. 3 (La. App. 4th Cir. 01/11/07), 948 So. 2d 348, 351. More precisely, four elements are necessary for the confection of a valid contract: (1) the parties must have the capacity to contract; (2) the parties must freely give their mutual consent to the contract; (3) the parties must have a cause or reason for obligating themselves; and (4) the contract must have a lawful purpose. *Ingraffia v. NME Hospitals, Inc.* 943 F.2d 561, 565 (5th Cir. 1991). Per Article 1927, "[a] contract is formed by the consent of the parties established through offer and acceptance." LA. CIV. CODE art. 1927; *Peironnet v. Matador Res. Co.*, 2012-2292 (La. 06/28/13); 144 So. 3d 791, 806.

Crucially, neither an offer nor acceptance must take a particular form to be effective. Rather, "[u]nless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent," and "[u]nless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made." LA. CIV. CODE art. 1927; *Read v. Willwoods Cmty.*, 2014-1475 (La.

03/14/15); 165 So. 3d 883, 887. But "an acceptance not in accordance with the terms of the offer is deemed to be a counteroffer." LA. CIV. CODE art. 1943; *Brandner v. Staf-Rath, L.L.C.*, 10-778 (La. App. 5 Cir. 04/26/11); 64 So. 3d 812, 816. Once created, a contract may only be revoked by mutual consent of the parties, LA. CIV. CODE art. 1983; *Guarantee Sys. Constr. & Restoration, Inc.*, 728 So. 2d at 403, and its interpretation requires "the determination of the common intent of the parties," LA. CIV. CODE art. 2045, as constricted by the plain document's four corners.

The Civil Code codifies two types of contracts. By definition, "[a]n offer that specifies a period of time for acceptance is irrevocable during that time," and "[w]hen the offeror manifests an intent to give the offeree a delay within which to accept, without specifying a time, the offer is irrevocable for a reasonable time." LA. CIV. CODE arts. 1928; *Ritter v. Exxon Mobile Corp.*, 2008 1404 (LA. App. 4 Cir. 09/09/09); 20 So. 3d 540, 546; *Myers v. Burger King Corp.,* 618 So. 2d 1123, 1126 (La. Ct. App. 1993). Defined in the negative, all other proposals that do not fit this definition are revocable "before . . . [being] accepted." LA. CIV. CODE arts. 1930; *Aloisio v. Christina*, 2013 0676 (La. App. 1 Cir. 02/03/14); 146 So. 3d 564, 566.

The Civil Code provides different rules for the acceptance of revocable and irrevocable offers. "An acceptance of an irrevocable offer is effective when *received* by the offeror," while acceptance of a revocable offer, "made in a manner and by a medium suggested by the offer or in a reasonable manner and by a reasonable medium, is effective when *transmitted* by the offeree." LA. CIV. CODE arts. 1934–35 (emphases added); *Kent v. Hogan*, 2003-2424 (La. App. 1 Cir. 10/29/04), 897 So. 2d 68, 71. A revocation of a revocable offer is effective when received by the offeree, so long as receipt occurred prior to acceptance. LA. CIV. CODE art. 1937; *Aloisio*, 146 So. 3d at 566. The next article contains the relevant definition of these Articles' chosen verb, "received": "A written revocation, rejection, or acceptance is received when it comes into the

possession of the addressee or of a person authorized by him to receive it, or when it is deposited in a place the addressee has indicated as the place for this or similar communications to be deposited for him." LA. CIV. CODE art. 1938; *Ambrose v. M & M Dodge, Inc.*, 509 So. 2d 444, 447 (La. Ct. App. 1987).

Even if all the foregoing hurdles have been crossed, "[c]onsent may be vitiated by error, fraud, or duress." LA. CIV. CODE art. 1948; *In re K.L.A.*, 2015-1410 (La. 6/30/2015); 172 So. 3d 601, 606 n.7. Typically, "duress" means no more than "a threat of harm made to compel a person to do something against his or her will or judgment" or, more specifically, "a wrongful threat made by one person to compel a manifestation of seeking assent by another person to a transaction without real volition." *Leonard v. Reeves*, 2011 1009 (La. App. 1 Cir. 01/12/12); 82 So. 3d 1250, 1261. As Article 1958 more narrowly defines it, for a threat to qualify as duress, it must be "of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation." LA. CIV. CODE art. 1959; *M.P.W. v. L.P.W.*, 2013 0366 (La. App. 1 Cir. 11/01/13); 136 So. 3d 37, 45.

## B.   APPLICATION

### 1.   Four Corners Analysis

With the Parties focused on two related questions central to establishing the enforceability of the Amended Loan Documents—whether Defendants consented and, if so, whether their consent predated their attempted revocation—plain law provides a plain answer: before Defendants' attempted rescission was received, those accords had become fully binding contracts voidable only with the Parties' "mutual consent," *W. N. Bergeron & Sons v. Caldwell Sugar Co-op, Inc.*, 340 So. 2d 1054, 1056 (La. Ct. App. 1976). Once consent has been

communicated "orally" or "by action or inaction . . . clearly indicative of consent," a contract is born, and any obligations enumerated therein gain the force and effect of law. LA. CIV. CODE art. 1927; *Petrohawk Props., L.P. v. Chesapeake Louisiana, L.P.*, 689 F.3d 380, 388 (5th Cir. 2012). And once a *written* acceptance "comes into possession of the addressee or of a person authorized by him to receive it" or "deposited in a place the addressee has indicated as the place for this . . . communication to be deposited," the same bond has formed. LA. CIV. CODE art. 1938; *see also Hanger One MLU, Inc. v. Unopened Succession of Rogers*, 43,120 (La. App. 2 Cir. 04/16/08); 981 So. 2d 175, 180. These principles guide this Court—and ultimately leave no room for complication. *See ScenicLand Constr. Co., L.L.C. v. St. Francis Med Ctr., Inc.*, 41,147 (La. App. 2 Cir. 07/26/06); 936 So.2d 251, 251 ("When a contract is subject to interpretation from the four corners of the instrument, without the necessity of extrinsic evidence, that interpretation is a matter of law.").

As a matter of indisputable fact, evidenced by the barest and clearest contractual text, Defendants executed the Amended Loan Documents on August 3, 2015. (Doc. 1-7 at 11; Doc. 1-8 at 7; Doc. 1-9 at 8; Doc. 8-11 at 12, 16; Doc. 8-12 at 8; Doc. 8-13 at 9; *see also, e.g.*, Doc. 11-2 at 2; Doc. 11-4 at 1, 3, 7.) By so signing, even after August 3, 2015, had passed,[10] Dr. Emery pegged their date of execution as August 3, 2015, as expressly stated on the eleventh page of the Amended Loan Agreement and pages eight of the Security and Guarantee. (Doc. 1-7 at 11; Doc. 1-8 at 7; Doc. 1-9 at 8; Doc. 8-11 at 12, 16; Doc. 8-12 at 8; Doc. 8-13 at 9.) Equally incontrovertibly, Dr. Emery explicitly promised to mail the executed contract to Plaintiff on August 11, 2015, (Doc. 11-4 at 5), a promise "indicative. . . clearly indicative of consent," LA. CIV. CODE art. 1927. Regardless, in the language of Article 1937, the Amended Loan Documents

---

[10] It is, in fact, quite clear that the Amended Loan Documents were signed after August 3, 2015, as they were not received until August 4, 2015, based on Temple's email. (Doc. 11-4 at 3.)

were finally "deposited in a place"—a UPS box, in an overnight envelope, duly marked—"the

addressee[, Temple,] ha[d] indicated as the place for this . . . communication to be deposited" on

August 20, 2015. (Doc. 11-1 at 2, 6–7; Doc. 11-4 at 1, 7.) At the latest, the Amended Loan

Documents came into Bank of America's possession sometime on August 21, 2016. (Doc. 11-1

at 2, 6–7; Doc. 11-4 at 1, 7.) In fact, even Dr. Emery concedes the signed Amended Loan

Documents were "returned to" Bank of America" on August 20, 2015; though "inadvertently

sent," the signed Amended Loan Documents were dispatched in the manner specified by Temple

hours, if not days, before Emery's Counsel pressed a single key. (Doc. 11-1 at 2, 7; Doc. 11-2 at

¶ 7 at 2.) Based on these unquestionable facts, in accordance with Louisiana's contract regime,

*see supra* Part III.A.2, Defendants' consent was effected by his post-dated signature on the

Amended Loan Documents on August 3, 2015, via the promise to send the signed documents

emailed to Temple on August 11, 2015, or by his placing of the UPS envelope in a designated

receptacle on August 20, 2015. By virtue of any of these distinct actions, Dr. Emery transmitted

Defendants' consent to the Amended Loan Documents. *See also, e.g.*, *Vidrine v. J & J*

*Exterminating Co.*, 09-285 (La. App. 3 Cir. 10/07/09); 20 So. 3d 585, 590 (finding no error in

trial court's conclusion that a party's signature on a form served as "demonstration of . . .

consent" for purposes of Article 1927); *Boudreaux v. Vankerkhove*, 2007 2555 (La. App. 1 Cir

08/11/08); 993 So. 2d 725, 731 ("The signatures of the parties in the written agreement . . . is

evidence of their consent to the contract . . . ."); *Spiers v. Seal*, 426 So. 2d 631, 634 (La. App. 1st

Cir. 1982) (finding acceptance to have been given on the same date that two parties signed the

pertinent agreement). In the end, when the law and facts are distilled, Defendants' consent was

duly provided, and three new contracts were formed.

In spite of the foregoing analysis, a fourth possible date for the consent's receipt logically exists: August 21, 2015, the date upon which the Amended Loan Documents arrived in Temple's office. Admittedly, Emery's Counsel emailed Temple in an attempt to revoke the contract on the afternoon of that very day; arguably, Plaintiff had rendered their offer irrevocable by allowing Defendants until August 21, 2015, to return the Amended Loan Documents pursuant to Article 1928. (Doc. 11-4 at 7, 11; *see also* Doc. 11-2 at 2.) Based on these facts—that the Amended Loan Documents were received on "the same day" as the rescission was sent, and that the offer was irrevocable until August 21, 2015—Defendants deny binding and effective consent was ever imparted. Aside from the fact that Defendants' consent had already been transmitted and received by several different means, both contentions overlook key legal facts. First, the term "same day" is not synonymous with "same time" or equal to "right before," but "same day" is all that Defendants have so far said. Unfortunately, absent proof that the recessionary email arrived before the Amended Loan Documents came into Plaintiff's possession, the former could not be effective as a matter of law, regardless of whether or not the Amended Loan Documents constituted an irrevocable offer. While Defendants needed to provide some such temporally significant evidence to meet their burden under Rule 56, not even the requisite scintilla has been proffered, and this particular attack must fail. Second, Defendants overstate the import of Temple's original extension. True, "[a]n offer that specifies a period of time for acceptance is irrevocable during that time," LA. CIV. CODE art. 1928, but that "period of time," per Temple's email, expired at midnight on August 20, 2015, (Doc. 11-4 at 7). By August 21, 2015, the offer thus became revocable, and acceptance of a revocable offer is "effective when transmitted by the offeree," LA. CIV. CODE art. 1935. By August 20, 2015, Dr. Emery had already done so.[11]

---

[11] A final argument, unexplored by Plaintiff, militates against Defendants' position. To the extent the Amended Loan Documents reflected the changes to the Loan Agreement proposed by Dr.

2.      **Defendants' Remaining Arguments**

None of Defendants' four[12] counter-arguments, both for their own dispositive motion and against Plaintiff's MSJ, undermine this sensible conclusion.

First, Temple's simple threat to exercise every legal option already authorized by the original loan upon Defendants' alleged default simply cannot constitute "duress" under controlling law. As Article 1962 simply states, "[a] threat of doing a lawful act or a threat of exercising a right does not constitute duress." LA. CIV. CODE art. 1962; *Tate v. Woman's Hosp. Found.*, 2010-0425 (La. 01/19/11); 56 So. 3d 194, 198. Consequently, "it is not duress to institute or threaten to institute civil suits, or take proceedings in court, or for any person to declare that he intends to use the courts wherein to insist upon what he believes to be his legal rights." *Southmark Props. v. Charles House Corp.*, 742 F.2d 862, 876 (5th Cir. 1984); *accord, e.g., Bd. of Comm'rs v. Turner Marine Bulk*, 629 So. 2d 1278, 1282 (La. Ct. App. 1993). Fatally for Defendants' case, Temple and Bank of America did no more, Temple only promising to invoke the Amended Loan Documents' remedies for Defendants' apparent breach. *See, e.g., Sumrall v. Ricoh USA, Inc.*, No. 15-00061, 2015 U.S. Dist. LEXIS 101672, at *19, 2015 WL 4644328, at *8 (M.D. La. Aug. 4, 2015) (observing that, under Louisiana law, "the threat of a lawful activity did not constitute duress"); *Comeaux v, Entergy Corp.*, 98-451 (La. App. 5 Cir.

---

Emery on July 17, 2016, (Doc. 1-6 at 1), it reflected Bank of America's *consent* to Dr. Emery's own *offer*. If so viewed, then the requisite contractual relationship arose when Bank of America first sent the Amended Loan Documents to Dr. Emery on August 3, 2015. However, if the Amended Loan Documents differed in any way, they would constitute a counter-offer, and Defendants' consent would still have been required to bind the Parties. As this Court has concluded, Dr. Emery imparted his consent before rescission was ever attempted.

[12] Defendants have raised no questions about the guarantee's validity or the Amended Loan Agreement's attorneys' fees provision.

04/14/99); 734 So. 2d 105, 107 ("Louisiana appellate courts have held that financial strait does not constitute duress.").

Second (and relatedly), the fact that Temple and, therefore, Bank of America urged Dr. Emery to sign despite his apparent uncertainty about the agreement's pivotal terms[13] does not equate to "bad faith," as defined by Article 1759. Rather, under Louisiana law, "[a] person who signs a written contract is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain its meaning." *Carter Logging, L.L.C. v. Flynn*, 44,188 (La. App. 2 Cir. 04/08/09); 7 So. 3d 195, 198. As such, based on well-settled jurisprudence, Dr. Emery alone bore the duty to have the Amended Loan Documents examined by his own counsel prior to its execution, and he cannot now avoid the consequences of doing so by thrusting blame for their ignorance onto Plaintiff via Article 1759. *See, e.g.*, *Tweedel v. Brasseaux*, 433 So. 2d 133, 137 (La. 1983); *Murphy v. Hussey*, 117 La. 390 (La. 1906). Stated differently, as no party may "avoid its [contractual] obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain its meaning," another's unwillingness to explicate a clause or clarify a misunderstanding cannot be the kind of "bad faith" prohibited by Article 1759. *Dulin*, 836 So. 2d at 345; *see also Griffin v. Lago Espanol, L.L.C.,* 00-2544 (La. App. 1st Cir. 2/15/02); 808 So. 2d 833, 840.

---

[13] According to Bank of America, it did more than ignore Defendants' concerns. While it may not have explained the contract to Dr. Emery, it did urge her to consult an attorney and granted her additional time to send the executed agreement. (Doc. 11-4 at 7.)

Third, the fact that the Amended Loan Documents had not yet been "booked"[14] as of August 21, 2015, (Doc. 11-4 at 25), has no effect on that contract's legal existence. Once Defendants gave their consent, a binding obligation had been formed and consummated in accordance with Article 1906. Indeed, as Temple explained, by August 23, 2015, the Amended Loan Documents had already been "booked . . . as they were executed and received by me on Friday, August[] 21st." (*Id.*) As the Civil Code recognizes no other requirement, by precedent and statute, this Court is bound to apply the Amended Loan Documents' unambiguous import.[15] *See, e.g.*, *Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 325–26 (3d Cir. 1997).

Finally, whether or not Dr. Emery made a counteroffer on August 21, 2015, is irrelevant. Per biding law, his signature on and transmission of the Amended Loan Documents had engendered a legal relationship, one which could be dissolved only with the Parties' mutual consent, before that offer was ever made. At best no more than an offer for another amendment, Dr. Emery's email could not nullify a contract already signed and received. In fact, for the same reason, the September 10, 2015, letter sent by Bank of America and seeking to correct Section 2 of the Amended Loan Agreement was no counteroffer. Instead, it sought "to add to" a single section and left every other provision undisturbed. (Doc. 11-4 at 31.) The agreement had already been forged, binding each party to its terms; with that letter, Plaintiff evinced no intent "to extinguish the original obligation." LA CIV. CODE art. 1880. On this point the law is crystal clear:

---

[14] As part of this argument, Defendants define "booked" as identical to "processed" and "accepted." (Doc. 11-1 at 3.) Unfortunately, regardless of whether or not these words are colloquial synonyms, Defendants' consent had already been given. *See supra* Part III.B.1.

[15] Of course, a contract may still fail for a variety of reasons, including duress. *See supra* Part III.A.2. Defendants, however, have invoked only the defenses of duress and bad faith and argued for a lack of consent.

"Mere modification of an obligation, made without intention to extinguish it, does not effect a novation." *Id.* art. 1881. The old contract remained, binding Plaintiff and Defendants alike.[16]

## IV.   CONCLUSION

By his own choice, Dr. Emery committed Defendants to the terms of the Amended Loan Documents in the summer of 2015. With his signature affixed and with knowledge of the contracts' particulars presumed under governing law, every paper signed—the Amended Loan Agreement, Security, and Guaranty—must be deemed binding on and enforceable against Dr. Emery and Emery DDS. Accordingly, this Court GRANTS Plaintiff's Motion for Summary Judgment, (Doc. 8), and DENIES Defendants' Opposition to and Cross Motion for Summary Judgment, (Doc. 11).

Signed in Baton Rouge, Louisiana, on July 28, 2016.


JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

---

[16] Logically, therefore, unless Dr. Emery signed off on the scrivener's error, the correction proposed therein has no legal effect at this time. What is good for the goose is good for the gander.